Date signed December 21, 2012



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | Case Nos. 01-64463-JS through 01-64485-JS (Jointly Administered |
| RAILWORKS CORPORATION, et al., | * | under 01-64463-JS) |
| Debtors | * | (Chapter 11) |
| * * * * * * * | * | * * * * * |
| ZVI GUTTMAN, Litigation Trustee, | * | |
| Plaintiff, | * | |
| v. | * | Adversary No. 03-5363-JS |
| CONSTRUCTION PROGRAM GROUP, | * | |
| Defendant | * | |
| * * * * * * * | * | * * * * * |

### *MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT*

This matter came on for hearing on July 28, 2011, upon cross motions for summary judgment. For the reasons stated, the plaintiff's motion will be denied, the defendant's motion will be granted and the instant complaint will be dismissed.

## FINDINGS OF FACT

1. On September 20, 2001 (the "petition date"), Railworks Corporation and 21 of its corporate affiliates ("the debtors," or "Railworks") filed voluntary Chapter 11 bankruptcy petitions in this Court (Case Nos. 01-64463-SD through 01-64485-SD). The cases are jointly administered under Case No. 01-64463-SD.[1]

2. The debtors described their business operations and financial condition in a motion for joint consolidation of cases that they filed on the petition date:

> Railworks Corporation ("Railworks") owns or controls, directly or indirectly, thirty-two (32) U.S. and foreign subsidiaries (collectively with Railworks, "the Company"). Railworks and its twenty-two (22) U.S. subsidiaries are all co-debtors in these proceedings. (Footnote: Railworks' eight Canadian subsidiaries, one inactive, no asset U.S. subsidiary, and one Chilean subsidiary are not debtors in these proceedings. Of the six joint ventures, four are exclusively between Railworks entities and only two involve third-parties.)
>
> The Debtors are a leading national provider of rail systems services, including construction and rehabilitation, repair and maintenance, and rail related products. The Debtors provide contracting services and rail related products to a broad range of customers including Class I railroads, transit authorities and commuter railroads,

---

[1] These cases were originally assigned to the Honorable E. Stephen Derby. Upon his qualified retirement, they were reassigned to the author of this opinion.

municipalities, industrial companies, and commercial enterprises. The Debtors operate principally in the U.S. and Canada, with occasional activity in Mexico and Central America. Collectively with their non-debtor affiliates, the Debtors have more than three thousand (3,000) employees. Railworks common stock is publicly traded on the NASDAQ trading system under the symbol "RWKS."

The Debtors' operations generally consist of three segments: (i) transit services; (ii) rail track services; and (iii) rail products and supplies. The transit services segment provides a variety of products and services for rail based mass transit systems, including construction and rehabilitation of track and other forms of fixed guideways , installation of signaling, communication and electrical systems, and construction, rehabilitation and installation of ancillary transit related subsystems such as elevators, escalators, heating and air conditioning. The rail track services segment provides design, engineering, construction, rehabilitation and repair and maintenance of track systems for railroads and industry. The rail products and supplies segment provides specialty wood and concrete products, rail fastening systems and specialized track maintenance services.

As of June 30, 2001, the Company had total assets of $569,658,000, and total liabilities of $523,289,000 (book value). For the three (3) months ending June 30, 2001, the Company sustained a net loss of $37.5 million. . . .

Debtors' Motion for Order Directing Joint Administration [P. 2], ¶¶ 5-8, filed September 20, 2001.

3. On December 5, 2001, the debtors filed their Statement of Financial Affairs [P. 330] and Schedules [P. 331], which indicated that as of the petition date, the debtors were insolvent, with assets totaling $ 167,693,102, as opposed to liabilities of $590,241,392. Summary of Schedules

3

4.  On September 23, 2002, the debtors filed a Modified Second Amended Joint Plan of Reorganization (the "Plan").

5.  On October 1, 2002, Judge Derby confirmed the Plan by order [P. 1274].  The Plan provided for two separate entities, namely, the "Reorganized Debtor" and a "Litigation Trust" ("the Trust").  Plan, §§ 5.15 and 5.25.  While most of the assets of the estate were transferred to the Reorganized Debtor, the Plan transferred so-called "Litigation Trust Claims" to the Litigation Trustee.  As defined by the Plan, Litigation Trust Claims ("Trust Claims") included "claims for the avoidance of any transfer by or obligation of the Estates or the Debtors under chapter 5 of the Bankruptcy Code or the recovery of the value of such transfer."  Plan, § I.A.1.88.

6.  Zvi Guttman was appointed Litigation Trustee ("the Trustee").  In accordance with the Plan, the Reorganized Debtors and the Trustee entered into a Litigation Trust Agreement ("LTA"), Section 8.1(h) of which conferred upon him the exclusive power and discretion to prosecute the Trust claims.

7.  On September 16, 2003, the Trustee filed the instant complaint against the defendant, Construction Program Group ("the defendant," or "CPG") to recover the

4

sum of $2,178,041, which the complaint alleged was paid by Railworks to CPG during the 90-day preference period, comprised of the following payments:[2]

| Check # | Check Date | Clear Date | Amount |
|---|---|---|---|
| 8554 | 07/20/2001 | 07/24/2001 | $472,788.75 |
| 8575 | 07/27/2001 | 08/02/2001 | 472,787.75 |
| 8601 | 08/10/2001 | 08/15/2001 | 472,788.75 |
| 8261 | 08/17/2001 | 08/23/2001 | 695,141.75 |
| **TOTAL** | | $2,113,507.00 | |

8. The complaint alleged that during the year 2001, CPG invoiced Railworks for certain insurance policies covering general liability, automobile and workers compensation that were obtained from TIG Insurance Company ("TIG"). Invoices

---

[2]As originally filed, the complaint sought the avoidance and recovery of five payments totaling $2,178,041 paid to CPG during the preference period. However, because the Trustee was only able to verify the four checks listed above that totaled $2,113,507, he deducted the unverified transfer in the amount of $64,534.00 from the amount claimed. Railworks tendered checks in payment of the CPG Invoices. Plaintiff's Exhibit No. 2. On January 18, 2002, CPG filed Proof of Claim No. 1980 in the amount of $498,758. Railworks scheduled the claim in the slightly higher amount of $499,999.50. All of the invoices submitted by CPG that were attached in support of the claim were in the name of "TIG Insurance Company" and represented unpaid insurance premiums owed to TIG by Railworks and its various affiliates and/or subsidiaries. CPG has since withdrawn the claim. Proof of Claim No. 1980.

5

dated January 31, 2001 and February 2, 2001. Plaintiff's Exhibit No. 1. The complaint further alleged that CPG negotiated all four checks during the preference period.

9. Sherwood Insurance Services ("Sherwood)" was predecessor in interest to CPG with respect to a certain General Agency Agreement by and between TIG and Sherwood, that was effective on December 15, 1996 (the "Agreement"). Plaintiff's Exhibit No. 4. *See also* Response to Interrogatory No. 1, at 3 of Defendant's Response to Plaintiff's First Set of Interrogatories. Plaintiff's Exhibit No. 5.

10. Under the Agreement, CPG acted as "Managing General Underwriter" ("MGU") for the insurance coverage that TIG, the insurance carrier and insurer, provided to Railworks, as insured.

11. According to the deposition testimony of Donald P. Koziol ("Koziol"), corporate designee of CPG, who identified himself as an employee of Aon Corporation ("Aon") and the Chief Executive Officer of Aon Underwriting Managers:[3]

> . . . [T]he way that the managing general underwriting business works, and this may help understand the whole concept, so that the client of the managing general underwriter is the carrier, and in this case the managing general underwriter possesses an intellectual property that the carrier wants to have access to.
>
> So if a carrier believes that the managing general underwriter has an expertise that doesn't exist within the carrier's portfolio, . . . the

---

[3]Aon was the indirect parent company of CPG. Plaintiff's Exhibit No. 7, at T9.

carrier will contract with the managing general underwriter to perform certain services for the carrier.

And those services for the carrier will vary from time to time, but generally will include the fact that . . . the managing general underwriter will determine the underwriting criteria, and they'll determine the pricing, and they'll be responsible for marketing on behalf of the carrier. In some cases that will extend to the handling of the claims.

And so the managing general underwriting agreement with the carrier will outline the fees and compensation that the carrier will give to the managing general underwriter for carrying out those services for the carrier. And in this case, one must understand that if the carrier becomes unhappy with the performance of the managing general underwriter, then the managing general underwriter is in fact out of business, because it has nothing to sell, which is why the carrier is the client, if you will, of the managing general underwriter.

. . [O]ne of the services that the managing general underwriter would provide for the carrier is to collect premium payments which payments are then passed on to the carrier in exchange for the carrier providing coverage for the person that's seeking insurance.

Deposition of Koziol, February 18, 2011, T. 15, line 23 through T. 17, line 8.

Plaintiff's Exhibit No. 6.

12. Section 5.1 of the Agreement provided as follows:

Agent [CPG] shall be liable for and shall pay to Company [TIG], all net premiums attributable to the Policies produced hereunder, whether or not such premiums have been collected by Agent less Commissions, as defined in Section 6.1 of this Agreement.

Agency Agreement. Plaintiff's Exhibit 4 at p. 5, Section 5.1.

7

13.  Section 5.2 of the Agreement provided as follows:

5.2.   All premiums collected by the Agent are the property of the Company and shall be held in trust on behalf of Company in a fiduciary capacity ("Premium Trust Funds") and shall be deposited and maintained in an account separate and segregated from Agent's own funds or, at Agent's option, the Premium Trust Funds may be maintained in a pooled account maintained by affiliates of Agent for the investment of fiduciary funds ("the Premium Trust Account").  The Premium Trust Account shall be maintained in an account at least equal to the premiums (unpaid to Company), and  return premiums (unpaid to policyholders or insureds) received by Agent less return premiums due to cancellations and endorsements.  After such funds have been deposited into the Premium Trust Account, Agent may deduct from such account the appropriate Commission.   The privilege of retaining Commission shall not be construed as changing this fiduciary relationship.

Company authorizes Agent to retain premiums in an interest-bearing trust account in a non-affiliated bank approved by Company in writing which meets the "Premium Trust Account Guidelines," a copy of which is set forth in Exhibit B attached hereto and incorporated herein by this reference and as reasonably modified from time to time by Company without the need for amending this Agreement, with interest payable to Agent until such amounts are due to Company, as set forth below, and to deduct Commissions from the premiums so collected.

Agent shall be responsible for full compliance with applicable laws, regulations, rules, and requirements regarding the Premium Trust Funds.

*Id.*, Section 5.2.

14.   Section 6.1 of the Agreement provided that TIG shall pay CPG "a

Commission on gross premiums for all Policies written and received pursuant to the

8

Commission Schedule attached" to the Agency Agreement as Exhibit C. Plaintiff's

Exhibit No. 4.3.[4]

15. Koziol testified that if Section 5.1 of the Agency Agreement applied, then

CPG would be liable to TIG for any insurance premiums that Railworks failed to pay.[5]

---

[4]Although the Commission Schedule purported to limit CPG's commission to 19.5% of gross written premiums for the policy year at issue, documents produced by CPG in discovery reflected an actual commission of 25%. Agreement, Plaintiff's Exhibit No. 8.

[5]The following portion of the deposition transcript relates to this point:

Q. Mr. Koziol, generally if an insured failed to pay an invoice for insurance coverage, is the managing general underwriter liable to make the payment on behalf of the insured?

A. Each managing general underwriter agreement addresses that and they address it differently. In some cases, yes. The premium is deemed to be collected whether the MGU collects it or not.

Q. Okay. And then I'd like you to refer to what's been marked as Exhibit 10, the general agency agreement.

A. Yes.

Q. Under this agreement, if this agreement were the one that operated as to Railworks' payments made back in 2001, and if Railworks failed to pay an invoice for insurance coverage, would Sherwood Insurance Services be liable to make that payment on behalf of Railworks?

A. If you'll give me some time, I'll have to look for the appropriate clause that's in the agreement.

Q. Okay. Sure.

16.  Joan Miles ("Miles"), senior vice president of CPG, gave similar testimony

at her deposition.[6]

------

MS. SANKARAN:  Take your time.

A.  Yes, under Section 5, "Premiums and Accounting," Subsection 5.1, "Agent shall be liable for and pay and shall pay to company all net premiums attributable to the policies produced hereunder, whether or not such premiums have been collected by agent."

Q.  And I want you to assume that CPG was the assignee of Sherwood Insurance Services under this agreement. If Railworks failed to pay an invoice for insurance coverage, would CPG then have the obligation to make that payment on behalf of Railworks, assuming this agreement governed?

A.  If this agreement governed, and 5.1 was as written, I'd have to think that whomever was the party to this agreement would be responsible.

Koziol Transcript at 30-31.  Plaintiff's Exhibit No.7.

[6]Miles testified as follows:

Q.  Did CPG have the responsibility to pay premiums to TIG even if CPG didn't receive the premiums from the brokers?

A.  I believe it did, yes.

Q.  And why do you believe that?

A.  Looking at the contract, five, "Premiums And Accounting."

Q.  You're referring to section 5.1 on page 5 of Exhibit 1?

A.  5.1.

10

17.  The Remittance Reports generated by CPG indicate that with respect to the insurance policies, CPG earned a commission of 25% on all payments made by Railworks.  Plaintiff's Exhibit No. 8.  The complaint alleged that the remaining 75% of each payment made by Railworks constituted the net amount paid by Railworks for the insurance coverage provided by TIG; and that this 75% also constituted the amount for which CPG would be liable to TIG under Section 5.1 of the Agreement in the event that Railworks failed to pay the invoiced premium.  Seventy-five percent of the amount of the checks equaled $1,585,130.25.

18.  The Trustee contended that the premiums invoiced and the liability of CPG to pay them to TIG pursuant to Section 5.1 of the Agency Agreement were satisfied at 100% by reason of the transfers challenged in this proceeding.  He claimed that had

---

Q.  Sorry, Exhibit 10. Section 5.1, page 5, on Exhibit 10 where it says, "The Agent shall be liable for all and shall pay to company all net premiums attributable to the policies produced hereunder whether or not such premiums have been collected by the Agent less commissions?"

A.  Yes.

Q.  So that is to say if CPG was getting somewhere from the 20 to 30 percent on commissions that if it didn't collect a premium it was still obligated to pay the premium to TIG less the 20 to 30 percent?

A.  Yes.

Miles Transcript at T-56-7.  Plaintiff's Exhibit No. 6.

11

these payments not been made, TIG and CPG would have received the same treatment as other creditors, namely payment of a mere fraction of the face amount of their claims.  Plaintiff's Exhibit No. 3 at 9.

19.  On April 15, 2011, the Trustee filed a motion for partial summary judgment [P. 87], only as to the non-commission component of the insurance premiums received, because he assumed that the liability of CPG for recovery of the commissions was a matter of material dispute.  However, the Trustee has since changed his position and has asserted that the commissions in question are also recoverable from CPG because they represented transfers that were made for the benefit of CPG.

20.  On the same date, April 15, 2011, CPG filed its own motion for summary judgment [P. 89].

### CONCLUSIONS OF LAW

1.  The instant complaint to recover preferential transfers was brought by the Trustee pursuant to Section 547 of the U.S. Bankruptcy Code.[7]

---

[7]Section 547 provides, as follows:

#### § 547.  Preferences.

(a) In this section–

(1) "inventory" means personal property leased or furnished, held for sale or lease, or to be furnished under a contract for service, raw materials, work in process, or materials used or consumed in a business,

12

including farm products such as crops or livestock, held for sale or lease;

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

(3) "receivable" means right to payment, whether or not such right has been earned by performance; and

(4) a debt for a tax is incurred on the day when such tax is last payable without penalty, including any extension.

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property–

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made–

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if–

13

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(c) The trustee may not avoid under this section a transfer–

(1) to the extent that such transfer was–

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was–

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms;

(3) that creates a security interest in property acquired by the debtor–

(A) to the extent such security interest secures new value that was–

(i) given at or after the signing of a security agreement that contains a description of such property as collateral;

14

(ii) given by or on behalf of the secured party under such agreement;

(iii) given to enable the debtor to acquire such property; and

(iv) in fact used by the debtor to acquire such property; and

(B) that is perfected on or before 30 days after the debtor receives possession of such property;

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor–

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of–

(A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or

(ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; or

(B) the date on which new value was first given under the security agreement creating such security interest;

15

(6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title;

(7) to the extent such transfer was a bona fide payment of a debt for a domestic support obligation;

(8) if, in a case filed by an individual debtor whose debts are primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $600; or

(9) if, in a case filed by a debtor whose debts are not primarily consumer debts, the aggregate value of all property that constitutes or is affected by such transfer is less than $5,850.

(d) The trustee may avoid a transfer of an interest in property of the debtor transferred to or for the benefit of a surety to secure reimbursement of such a surety that furnished a bond or other obligation to dissolve a judicial lien that would have been avoidable by the trustee under subsection (b) of this section. The liability of such surety under such bond or obligation shall be discharged to the extent of the value of such property recovered by the trustee or the amount paid to the trustee.

(e)(1) For the purposes of this section–

(A) a transfer of real property other than fixtures, but including the interest of a seller or purchaser under a contract for the sale of real property, is perfected when a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee; and

(B) a transfer of a fixture or property other than real property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee.

(2) For the purposes of this section, except as provided in

16

———————————

paragraph (3) of this subsection, a transfer is made–

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, except as provided in subsection (c)(3)(B);

(B) at the time such transfer is perfected, if such transfer is perfected after such 30 days; or

(C) immediately before the date of the filing of the petition, if such transfer is not perfected at the later of–

(i) the commencement of the case; or

(ii) 30 days after such transfer takes effect between the transferor and the transferee.

(3) For the purposes of this section, a transfer is not made until the debtor has acquired rights in the property transferred.

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition.

(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section, and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

(h) The trustee may not avoid a transfer if such transfer was made as a part of an alternative repayment schedule between the debtor and any creditor of the debtor created by an approved nonprofit budget and credit counseling agency.

(i) If the trustee avoids under subsection (b) a transfer made

17

2.   This Court has subject matter jurisdiction over the instant adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue lies properly in this district pursuant to 28 U.S.C. § 1409.  The instant complaint is a core proceeding, pursuant to 28 U.S.C. § 157(b).

## *STANDING*

3.   The trustee of a liquidating trust created by a confirmed Chapter 11 plan has standing to pursue postconfirmation claims on behalf of the bankruptcy estate, where the plan provided that any recovery inures to the payment of unsecured claimants. *Guttman v. Martin (In re Railworks Corp.)*, 325 B.R. 709, 719-20 (Bankr. D. Md. 2005), citing 11 U.S.C. § 1123(b)(3).

## *SUMMARY JUDGMENT*

4.   The granting of summary judgment serves an essential purpose of avoiding wasted time and expense of unnecessary trials where (1) there are no disputes between the parties as to any material facts, (2) the parties disagree only as to legal questions

---

between 90 days and 1 year before the date of the filing of the petition, by the debtor to an entity that is not an insider for the benefit of a creditor that is an insider, such transfer shall be considered to be avoided under this section only with respect to the creditor that is an insider.

11 U.S.C. § 547.

18

as they may apply to the agreed facts, and (3) a party is entitled to judgment as a matter

of law on any given issue.[8]

_____

[8]Federal Rule of Civil Procedure 56 governing summary judgment, provides as follows:

### Rule 56.  Summary Judgment.

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(d) Case Not Fully Adjudicated on Motion. If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good

19

faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

(f) When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(g) Affidavits Made in Bad Faith. Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused the other party to incur, including reasonable

20

5.  "A principal purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims and defenses."  *Sheets v. Butera*, 389 F.3d 772, 776 (8th Cir. 2004), cited in Brunet and Redish, *Summary Judgment Federal Law and Practice* (3d ed. 2006), § 1.1 at 3.

6.  Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

7.  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L. Ed.2d 265, 273 (1986).  After a movant makes a properly supported summary judgment motion, the nonmovant has the burden of setting forth specific facts showing the existence of a genuine issue of fact and must come forward with an affirmative showing of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L. Ed.2d 202, 213 (1986).

------

attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

Fed.R.Civ.P. 56.  Rule 56 is made applicable to proceedings in bankruptcy by Fed. R. Bankr. P. 7056.

8. The Fourth Circuit has emphasized that the question central to the assessment of a motion for summary judgment is the consideration of "whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007) quoting *Humboldt Express, Inc. v. Wise Co., Inc. ( Apex Express Corp)*, 190 F.3d 624, 633 (4th Cir. 1999).

## *CROSS MOTIONS FOR SUMMARY JUDGMENT AND BURDENS OF PROOF*

9. Because the plaintiff and defendant have each moved for summary judgment, each bears the initial burden set forth in Rule 56(c). Thus, when cross motions for summary judgment are filed, "each movant bears the burden of establishing that no genuine issue of material fact exists." *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 538–9 (5th Cir. 2004), *cert. denied*, 546 U.S. 816, 126 S.Ct. 342, 163 L. Ed.2d 54 (2005).

10. The Court must consider each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party. *Terwilliger v. Terwilliger*, 206 F.3d 240, 244 (2d Cir. 2000). *See also Wright v. Keokuk County Health Center*, 399 F. Supp.2d 938, 946 (S.D. Iowa 2005), quoting *EEOC v. Steamship Clerks Union Local 1066*, 48 F.3d 594, 603 n. 8 (1st Cir.1995) ("When faced with

22

cross-motions [for summary judgment], the normal course for the trial court is to 'consider each motion separately, drawing inferences against each movant in turn.'").

11. Therefore, neither side is necessarily entitled as a matter of law to be granted summary judgment merely because both parties filed opposing motions for summary judgment. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n. 4 (1st Cir.1997). In cases where genuine disputes of material fact are determined to exist, neither party filing cross motions is entitled to summary judgment, each having failed to meet its burden under Federal Rule 56. *See, for example, Field v. Insituform, Inc. (In re Abatement Environmental Services, Inc.)*, 307 B.R. 491, 497-500 (Bankr. D. Md. 2004).

12. In deciding whether to grant one of two cross motions for summary judgment on a complaint to avoid a preference, the issue is whether the well-pleaded, undisputed material facts indicate that payments made to the defendant are avoidable and recoverable pursuant to 11 U.S.C. §§ 547 and 550, or whether the same,

undisputed material facts indicate that the necessary elements of proving a preference have not been satisfied, or that the defendant has a valid defense.[9]

**THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

13. "A prima facie case for an avoidable preference under 11 U.S.C. § 547(b) is made by showing the following: (1) a transfer, (2) of an interest of the debtor in property, (3) to or for the benefit of a creditor, (4) for or on account of an antecedent debt owed by the debtor before such transfer was made, (5) made while the debtor was insolvent, (6) if the creditor was not an insider, made on or within 90 days before the date of the filing of the petition, (7) which enabled such creditor to receive more than he would have received if the transfer had not been made while the debtor continued into bankruptcy." *Kirtley v. Consol. Nutrition, L.C. ( In re Freeny)*, 187 B.R. 711, 715 (Bankr. N.D. Okla. 1995).

**TRANSFER OF AN INTEREST OF A DEBTOR IN PROPERTY**

14. The payment of insurance premiums by the debtors to CPG amounted to transfers by the debtors of interests in the debtors' property.

---

[9]The required elements of a preference must be proven by the plaintiff to make out a *prima facie* case, thereby requiring the defendant transferee to mount a defense. Thus, it is possible that the plaintiff could prove all of the elements of Section 547(b) and not be entitled to summary judgment if the defendant transferee were able to bear its burden of proof under Section 547(c). The standard of proof required to prove the elements of a preference is by a mere preponderance.

24

As the Seventh Circuit held in *Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir. 2001),

> A transfer is only preferential if what was transferred constituted an interest of the debtor in property. The Bankruptcy Code's definition of a transfer is "expansive," *Barnhill v. Johnson*, 503 U.S. 393, 400, 112 S.Ct. 1386, 118 L. Ed.2d 39 (1992), and encompasses "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(54). In the typical preference action, the debtor itself transfers something of value to a particular creditor.

*Id.* (Footnote omitted.) The four checks that constitute the transfers in question were in the name of the debtor Railworks, were written on its bank account, were signed by an officer of the debtor and cleared the debtor's account at Bank of America. Plaintiff's Exhibit No. 3. *See Field v. Md. Motor Truck Assoc., Workers Comp. Self–Ins. Group (In re George Transfer, Inc.)*, 259 B.R. 89, 95-6 (Bankr. D. Md. 2001) (insurance premium payment for workers' compensation coverage held to be recoverable by liquidating trustee as a preferential transfer.)

## *FOR OR ON ACCOUNT OF AN ANTECEDENT DEBT*

15. The Trustee has shown that the four transfers in question were made "for or on account of an antecedent debt" because the transfers, made by four checks, dated respectively July 24, and August 2, 15 and 23, 2001, related to past due invoices dated January and February 2001. The payments were past due to such a significant degree

that they were neither contemporaneous exchanges for new value, nor were they made in the ordinary course of business.

## MADE WHILE THE DEBTOR WAS INSOLVENT

16.    The undisputed facts indicate that Railworks and its affiliates were insolvent during the period when the transfers were made, based not only upon the statutory presumption of insolvency,[10] but also factually established by the debtors' own schedules.    Accordingly, the plaintiff has satisfied his burden of proving insolvency.  11 U.S.C. § 547(b)(3).  *See* Finding of Fact No. 3.

## MADE ON OR WITHIN 90 DAYS BEFORE THE FILING OF THE PETITION

17.    The parties agree that the transfers from the debtors to the defendant occurred on certain dates in certain amounts, by checks which were issued and paid within 90 days of the filing of the petition, the 90th day being June 22, 2001.

## TO OR FOR THE BENEFIT OF A CREDITOR, WHICH ENABLED THE CREDITOR TO RECEIVE MORE THAN IF THE TRANSFER HAD NOT BEEN MADE

18.    The premise for the Trustee's complaint, that CPG is a creditor of Railworks, is a material fact that the parties dispute, involving mixed questions of law and fact.  For example, the Trustee has shown, and the parties agree, that CPG was the

---

[10]For purposes of Section 547, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the Bankruptcy petition.  11 U.S.C. § 547(f).

*initial recipient* of the transfers. However, in order for the complaint to succeed, and likewise to be entitled to summary judgment, the Trustee must prove that CPG was the *initial transferee* of the transfers made by the debtors, and was therefore a creditor. The Trustee points to the claim filed and later withdrawn by CPG, as well as Section 5.1 of the Agreement that imposes liability upon CPG for premiums unpaid by Railworks, as undisputed facts proving CPG to have been a creditor. The Trustee fudges the distinction between TIG and CPG and states that the transfers enabled them to receive more than they would have received in a Chapter 7 liquidation, citing for support the Trustee's deposition testimony to the effect that general unsecured creditors will receive far less that 100% of their claims.

19.  On the other hand, CPG responds that it was not a creditor, but merely the agent of the creditor, TIG, and that because it was required by the Agreement to collect the premiums and turn them over to TIG, it was a mere conduit for the transfers. Looking behind the claim filed by CPG against Railworks in the bankruptcy case reveals that all of the invoices that were attached in support of the claim were in the name of TIG as creditor.

20.  Likewise, the Trustee has failed to prove that CPG obtained a benefit from the transfers it *actually received* from Railworks. The issue of whether such transfers absolved CPG from potential liability to TIG under Section 5.1 of the Agreement is a

27

question of law that cannot be proven using the testimony of lay witnesses.[11]  The deposition testimony of Koziol and Miles containing legal conclusions based upon hypothetical questions put to them by the Trustee as representatives of CPG, and offered as admissions against interest, are not admissible to support the Trustee's position.  Additionally, neither Koziol nor Miles was asked to testify regarding the operation of the Agreement in the ordinary course of CPG's business, *vis-a-vis* whether CPG had ever been held liable in the past for such unpaid premiums, nor was there a foundation laid to qualify either witness as an expert entitled to testify regarding whether the clause in question was standard in the industry.  Therefore, the Court will disregard the opinions of Koziol and Miles as they pertain to the potential liability of CPG liability to TIG under the Agreement.  See Fed. R. Evid. 701.

21.  For these reasons, the Trustee's allegation that CPG was a creditor of Railworks when it received the transfers in question is a material fact in dispute. The Trustee cannot obtain summary judgment because taking all of the evidence in the light

---

[11]The benefit issue presents a conundrum for the Trustee, who asserts that CPG benefitted from the transfers it received and paid over to TIG because it would have been liable to TIG for the premiums if it had failed to collect them from Railworks. Later, in response to the assertion by CPG that the transfers it received were required by the Agreement to be held in trust for TIG, the Trustee, without any supporting evidence, questioned whether the funds were properly deposited into a trust account. In effect, the Trustee is arguing against his own position.

28

most favorable to CPG, the Court cannot say that the Trustee is entitled to judgment as a matter of law.

### THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

22.  As indicated, CPG asserts that it acted as a mere conduit for the payment of insurance premiums to TIG, and as such, was not an "initial transferee."[12]  The question before the Court at the summary judgment stage is whether the assertion of mere conduit status is beyond dispute, based upon the evidence adduced up to this point, and therefore whether CPG is entitled to judgment as a matter of law.

23.  In the case of  *IBT Intern., Inc. v. Northern (In re Int'l Admin. Servs., Inc,)*,

---

[12]Section 550(a) refers to an "initial transferee in the following context:

### § 550. Liability of transferee of avoided transfer.

(a)  Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from –

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

408 F.3d 689, 705 (11th Cir. 2005), the Eleventh Circuit stated the following regarding

what is or is not an initial transferee:

> . . .The determination whether a particular party is an "initial transferee"
> within the meaning of § 550(a)(1) has not been as straightforward as the
> language itself might suggest.  A strictly literal interpretation of the
> statutory term would suggest that the "initial transferee" of a transfer is
> the first party which received possession of the property in question after
> it left the hands of the debtor.  Generally, courts are disinclined to
> construe the statute in such a rigid manner because in many instances the
> initial recipient may have nothing to do with the debtor's property other
> than facilitating its transfer.

*Id.* [Citations omitted].

24.  In another case, the same circuit applied the following control or conduit test

to determine whether the recipient of a transfer was an initial transferee or a mere

conduit:

> . . .[A] recipient of an avoidable transfer is an initial transferee only if
> they exercise legal control over the assets received, such that they have
> the right to use the assets for their own purposes, and not if they merely
> served as a conduit for assets that were under the actual control of the
> debtor-transferor or the real initial transferee.  *See Nordberg v. Societe
> Generale ( In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199-1200
> (11th Cir.1988); *Nordberg v. Arab Banking Corp. ( In re Chase &
> Sanborn Corp.)*, 904 F.2d 588, 599, 599 n. 26 (11th Cir.1990); *Bonded
> Fin. Serv.*, 838 F.2d at 893; *In re Ogden*, 314 F.3d 1190, 1202, 1204
> (10th Cir.2002).
>
> This test takes on special significance where the recipients of
> avoidable transfers are agents or fiduciaries of the debtor-transferor, such
> as banks or, in this case, insurance brokers, who are duty-bound to take
> only limited actions with respect to the funds received.  *See, e.g.,*

[*Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*], 848 F.2d 1196 (11th Cir.1988)] *Societe Generale*, 848 F.2d at 1200 (finding that debtor's bank was not an initial transferee); [*Bailey v. Big Sky Motors, Ltd. ( In re Ogden )*, 314 F.3d 1190 (10th Cir.2002)] *Ogden*, 314 F.3d at 1202 (finding that an escrow agent was not an initial transferee); [*Bonded Fin. Serv., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir.1988)] *Bonded Fin. Serv.*, 838 F.2d at 893 (bank); [*Pope v. Wilkerson*] *In re Ala. State Fair Auth.*, 232 B.R. 252, 271-72 (N.D. Ala. 1999) (finding that an insurance broker was not an initial transferee).  Often these fiduciaries or agents are not considered initial transferees because their legal control over the assets received is circumscribed by their legal duties to their clients.  *See Societe Generale*, 848 F.2d at 1200 (contrasting, for the purposes of determining whether a bank was an initial transferee, a bank's receipt of funds for the sole purpose of depositing them in a customer's account with the receipt of funds earmarked for the payment of a debt owed to the bank); *Ogden*, 314 F.3d at 1202 (finding that an escrow agent was not an initial transferee where funds received were intended for a trust account); *Bonded Fin. Serv.*, 838 F.2d at 893 ("[W]e think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.  When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."); *Ala. State Fair Auth.*, 232 B.R. at 271-72 (finding that an insurance broker who held a debtor's assets in trust for payment to insurance companies was not an initial transferee).  This can be true even where the transferred assets ultimately come under the agent's or fiduciary's full control through a subsequent transfer.  *See Bonded Fin. Serv.*, 838 F.2d at 893 (finding that a bank became a mediate, but not initial, transferee only after the debtor-transferor directed it to apply funds initially transferred to the debtor's account toward repayment of a loan from the bank).

*Andreini & Co. v. Pony Express Delivery Services (In re Pony Express Delivery Services, Inc.)*, 440 F.3d 1296, 1300–01 (11th Cir.2006) (holding that an insurance

broker that collected premiums on insurance policies on behalf of a carrier was a conduit and not an initial transferee).

25.  In the context of a postpetition transfer, but equally applicable here, the Fourth Circuit held in *Bowers v. Atlanta Motor Speedway, Inc. ( In re Southeast Hotel Props. Ltd. P'ship)*, 99 F.3d 151, 154-55 (4th Cir. 1996), endorsed the view of the Seventh Circuit in *Bonded Financial Services, supra*, that "legal dominion and control" over a transfer, that is the unrestricted right to use the transferred property for one's own purposes, is required in order for the initial recipient of a transferee to constitute an initial transferee:

> In *Bonded*, the Seventh Circuit articulated a "dominion and control" test for determining whether an entity is an "initial transferee" under § 550.  According to the Bonded court, "the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded*, 838 F.2d at 893. The court stated further that " 'transferee' is not a self-defining term; it must mean something different from 'possessor' or 'holder' or 'agent.'" *Id.* at 894.   Finally, the *Bonded* court held that the terms "initial transferee" and "entity for whose benefit [the] transfer was made" as used in § 550 are mutually exclusive, precluding an entity from constituting both the transferee and the entity for whose benefit such transfer was made. *Id.* at 895-96.[13]

___

[13]This latter holding, that under Section 550, the "transferee and the entity for whose benefit such transfer was made" are mutually exclusive, effectively disposes of the complaint, which being premised upon mutually exclusive assertions, that of both receipt of transfer and benefit, cannot have it both ways.  The Trustee contends that because of CPG's liability to TIG under Section 5.1 of the Agreement, it was a contingent creditor of the debtors and therefore, the transfers received by CPG were

32

*Id.*

26.  Applying this test to the instant case, this Court concludes that CPG was a mere conduit and not an initial transferee, based upon the following analysis.

27.  Paragraph 5.2 of the Agreement created an express trust, with CPG as trustee in favor of TIG.  *See Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 161 (Bankr. D. Md. 1998) (defining express trusts as "those which are created by the direct and positive acts of the parties, by some writing, or deed, or will, or by words either expressly or impliedly evincing an intention to create a trust.'") (citations omitted).

---

for the benefit of CPG as both a debtor of TIG and a creditor of Railworks.  For this proposition, the Memorandum filed by the Trustee on April 15, 2011, incorrectly cited *Southeast Hotel, supra*, which stands for the opposite proposition:

> Here, because the Transfers simultaneously satisfied the Debtor's debt to TIG and CPG's obligation under the Agency Agreement, CPG falls squarely within the "traditional example" of "someone who received the benefit but not the money."  Furthermore, while § 550(b) provides immediate or mediate transferees with certain defenses, there is no such protection for the initial transferee or the entity for whose benefit the transfer was made.  *In re Southeast Hotel Properties Ltd. Partnership*, 99 F.3d 151, 154 (4th Cir. 1996)("...neither the initial transferee nor the entity for whose benefit such transfer was made") receives this protection.  [citation omitted]  Rather, "the trustee's power to recover from these entities under § 550(a)(1) is absolute").  Thus, even if the Trustee's claim under § 547(b) is stated solely in terms of the avoidability of the transfer as against TIG, which CPG has inherently conceded in its various papers, § 550(a) allows the Plaintiff to recover from CPG, the party benefitted by the Transfers.

Trustee's Memorandum [P. 88 ] at 12.

33

Therefore, while CPG had physical control over the transfers it received, it did not have the legal right to use them as it pleased, but was required to hold them in trust for its principal, TIG. *See Guttman v. Associates Commercial Corp. (In re Furley's Transport, Inc.)*, 272 B.R. 161, 177 (Bankr. D. Md. 2001) (restating the requirement established by the Fourth Circuit in *Southeast Hotel supra*, that "in order to be an initial transferee, a party must exercise legal dominion and control over the property," and that "physical possession is not enough").

28. No contractual relationship existed between Railworks and CPG that required CPG to guarantee the insurance premium payments by Railworks to TIG. In any event, "a party cannot be an initial transferee if he is a mere conduit for the party who had a direct business relationship with the debtor." *Lowry v. Security Pac. Business Credit, Inc. (In re Columbia Data Products, Inc.)*, 892 F.2d 26, 28 (4th Cir.1989).

29. The Agreement between TIG and CPG did not purport to make CPG a guarantor of Railworks for its payment of insurance premiums to TIG.

30. Whether the Agreement imposed any liability upon CPG as a fiduciary to TIG for the amounts of uncollected payments from Railworks is a moot point, because the payments in question, *as a matter of undisputed fact*, were received and collected.

34

Therefore, Section 5.1 of the Agreement does not support a cause of action for the recovery of alleged preferential transfers from CPG by the Trustee.

31.  On this point (and others), this Court finds instructive the venerable case of *Carson v. Federal Reserve Bank*, 254 N.Y. 218, 172 N.E. 475 (N.Y. 1930), in which the Court of Appeals of New York held that 157 checks collected from a bankrupt entity by the Federal Reserve Bank of New York, as collecting bank of debts due to member banks, were not recoverable preferences in an action by bankruptcy trustees, the collecting bank having acted as agent, and not as the owner of the funds.  In the course of the opinion by then-Judge Cardozo, the court held that conduct between the agent and its principals after the agent received the transfers did not convert them into preferences:

> If the defendant [Federal Reserve Bank of New York] was an agent
> in the receipt of the Zartman [the bankrupt's] drafts and the substituted
> moneys, the question must still be met whether its liability was enlarged
> by any of its acts thereafter.  We must say whether the agent became
> subject to the liability of an owner when instead of remitting the proceeds
> of collection directly to its principals, it put the proceeds to their credit in
> an ordinary deposit account, thereby turning the relation from one of
> agency into one of creditor and debtor.  In effect, the situation was then
> the same as if the defendant, receiving the money in the capacity of agent,
> had handed it over to the principals, and had received it back at once to
> be retained as a deposit.  *Commercial Nat. Bank of Penn. v. Armstrong*,
> 148 U. S. 50, 58, 59, 13 S. Ct. 533, 37 L. Ed. 363; *Marine Bank v. Fulton
> County Bank*, 2 Wall. 252, 17 L. Ed. 785; *Evansville Bank v.
> German-American Bank*, 155 U. S. 556, 15 S. Ct. 221, 39 L. Ed. 259;
> *National Butchers' & Drovers' Bank v. Hubbell*, 117 N. Y. 384, 396, 22

35

N. E. 1031, 7 L. R. A. 852, 15 Am. St. Rep. 515; *Langley v. Warner*, 3 N. Y. 327, 329.  We think the new relation did not take from the defendant the protection of the rule that money paid to an agent, and lawfully accepted, may not thereafter be reclaimed by one who has made the payment with notice of the agency, if before the attempted reclamation the agent in good faith has settled with the principal. *National Park Bank of New York v. Seaboard Bank*, 114 N. Y. 28, 20 N. E. 632, 11 Am. St. Rep. 612; *National City Bank of Brooklyn v. Westcott*, 118 N. Y. 468, 473, 474, 23 N. E. 900, 16 Am. St. Rep. 771; *Hooper v. Robinson*, 98 U. S. 528, 25 L. Ed. 219; *Buller v. Harrison*, 2 Cowp. 565. True, indeed, it is that the settlement sufficient to call this precept into play must be actual and not constructive.  *Buller v. Harrison, supra*; *Mowatt v. McLelan*, 1 Wend. 173, 178; *La Farge v. Kneeland*, 7 Cow. 456, 460.  If all that the agent has done is to agree with the principal that the fund, still intact, shall be held thereafter as a debtor, he is not subjected to any loss if directed to make restitution out of the moneys thus retained.  *Cf. La Farge v. Kneeland* and *Mowatt v. McLelan*, *supra*. On the other hand, when once the fund has been depleted by payment of the debt, the situation becomes the same as if the payment to the principal had been made at the beginning.  The agent is no better off by reason of the new relation, but even if no better, he is equally no worse.

254 N.Y. at 230-31, 172 N.E. at 479-80.[14]

32.  CPG is not and was not a creditor of the debtors, in its limited capacity as an agent of its principal, TIG.  The undisputed fact that Railworks was on notice that CPG was acting as a disclosed agent on behalf of TIG when Railworks made the transfers of premium payments to CPG is binding on the Trustee.

---

[14]*Salomon v. Nedlloyd, Inc. (In re Black & Geddes)*, 59 B.R. 873, 875, fn. 4, (Bankr. S.D. N.Y. 1986), found the *Carson* opinion to have "continued vitality," at least under New York law.

33.   Finally, the commissions CPG collected and paid to itself before turning over the net amount of the transfers to TIG in compliance with the trust terms of the Agreement did not render such commissions subject to the defendant's dominion and control so as to change this result.  The Agreement itself so provided.  Agreement, §5.2 ("The privilege of retaining Commission shall not be construed as changing this fiduciary relationship.").  The commissions in question were owed to CPG by TIG, not by Railworks.  The fact that CPG paid the commissions to itself, as provided by the Agreement, rather than pay the gross amount of the transfers to TIG and then wait for a separate payment, is of no moment.  See, e.g., *Salomon v. Nedlloyd, Inc. (In re Black & Geddes)*, 59 B.R. 873, 874-75, fn. 2 (Bank. S.D. N.Y. 1986) (retention of commission by agent out of the funds it collected on behalf of disclosed principal did not leave it vulnerable to a preference attack because the commission was not owed by the debtor, commission was owed by the principal, which could have required the agent to turn over the entire amount to it and then issue its own check); and *Kirschenbaum v. Leeds Morelli & Brown P.C. (In re Robert Plan of New York Corp.)*, 456 B.R. 150, 159 (Bankr. E.D. N.Y. 2011) (law firm that deposited proceeds from settlement received from debtor into its escrow account, then disbursed net proceeds to creditor less contingency fee held to be mere conduit because amounts disbursed

were at the direction of creditor/client over which law firm had no dominion and control).

34.  Therefore, CPG is entitled to summary judgment as a matter of law because the fact is beyond dispute that it received the alleged preferential payments as an agent of TIG, and not as a creditor of Railworks.

WHEREFORE, the motion for summary judgment filed by CPG will be GRANTED, the motion for summary judgment filed by the Trustee will be DENIED, and the instant complaint will be DISMISSED.

***ORDER ACCORDINGLY.***

cc:    Richard Marc Goldberg, Esquire
        Diarmuid F. Gorham, Esquire
        John Joseph Leidig, Esquire
        Scott W. Foley. Esquire
        Paul V. Danielson, Esquire
        Shapiro Sher Guinot & Sandler
        36 South Charles Street, Suite 2000
        Baltimore, Maryland  21201
        Counsel for the Plaintiff

        Annapoorni R. Sankaran, Esquire
        Greenberg Traurig, LLP
        1000 Louisiana Street, Suite 1700
        Houston, Texas  77004

        David Daneman, Esquire
        Whiteford, Taylor & Preston, LLP
        7 Saint Paul Street
        Baltimore, Maryland  21202
        Counsel for the Defendant

        Construction Program Group, Defendant
        c/o Scott D. Cousins
        The Brandywine Building, Suite 1540
        Wilmington, Delaware  19801

        Zvi Guttman, Trustee, Plaintiff
        c/o Richard M. Goldberg
        Shapiro Sher Guinot & Sandler
        36 South Charles Street, 20th Flr.
        Baltimore, Maryland  21201

        Mark A. Neal, Esquire
        Office of the United States Trustee
        101 W. Lombard Street, Suite 2625
        Baltimore, Maryland  21201